## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| KENNETH HENIN, | ) | NO.  0:19-cv-336 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF'S BRIEF IN** |
| | ) | **OPPOSITION TO DEFENDANT'S** |
| SOO LINE RAILROAD, | ) | **MOTION TO DISMISS OR,** |
| | ) | **ALTERNATIVELY,** |
| Defendant. | ) | **SUMMARY JUDGMENT** |

TO:   DEFENDANT SOO LINE RAILROAD COMPANY, D/B/A CANADIAN PACIFIC, AND ITS ATTORNEYS TRACEY HOLMES DONESKY AND    GRETA    BAUER REYES, STINSON LEONARD STREET, 150 SOUTH FIFTH STREET, SUITE 2300, MINNEAPOLIS, MN  55402:

 Plaintiff objects to defendant's summary judgment motion.  We have filed the Affidavit of Keith E. Ekstrom which establishes reasons Plaintiff cannot present facts essential to justify his opposition without conducting discovery, pursuant to Federal Rule of Civil Procedure 56(d).

Plaintiff incorporates by reference the arguments and authorities in Plaintiff's Brief in Opposition to Defendant's Motion to Stay or Modify Portions of the Pretrial Scheduling Order.  In that brief, we demonstrate that Defendant's summary judgment in the ALJ proceeding was granted based on the affidavits of management witnesses who had not been disclosed prior to filing the motion.  The affidavit was signed in Canada without a notary.

In the present motion, defendant argues that "this matter has been litigated *for nearly six years"* and that there was an *"already developed administrative record."*  In fact, there was only a four-month discovery period followed by an immediate summary judgment motion.  The ALJ then sat on the motion for nearly two years, and defendants jurisdictional appeal took another two years.

49 USC 20109(d)(3) specifically authorizes an action for de novo trial in federal district court "if the delay was not due to bad faith on the employee's part." Defendant has not alleged any bad faith on Henin's part. 49 USC 20109 does not authorize summary judgment based on the OSHA ALJ record. Review of proceedings based on a closed record is called an appeal. 49 USC 20109 does authorize appeal to the 8th Circuit, an option which plaintiff did not choose. While plaintiff is not obligated to establish facts justifying trial de novo at the District Court level, it should be known that many workers are opting out of the ALJ route due to extreme delays. There have been massive delays in 20109 case filed with OSHA. In *Dakota Minnesota & Eastern RR v US Department of Labor*, 948 F3d 940 (8th Cir. 2020), the plaintiff railroad worker was terminated in 2012. After plaintiff won at the ALJ level, the railroad exercised their right to further appeal, and the decision on appeal was rendered January 30, 2020, *eight years* after the railroad worker was fired. In the present case, the defendant wasted almost *two years* with a meritless appeal. The appeal was filed on April 9, 2019, and the decision of the 8th Circuit was filed on March 4, 2021, almost two years later. Thus, defendant's own actions caused four years of delay, two with the summary judgment motion and two with the appeal. Given these massive delays and multiple opportunities for the defendant railroad to drag the case on with motions and appeals, it is not surprising that plaintiff Ken Henin opted out.

There have been no reported decisions where summary judgment was granted based on the record in the OSHA proceedings without affording the plaintiff the opportunity to conduct any discovery at the district court level. In *Gunderson v BNSF Ry.* 29 F. Supp. 3d 1259, 1261 (D. Minn. 2014), the court addressed the same argument raised by defendant, stating "there is no dispute that the Secretary did not issue a final decision within 210 days of the filing of Gunderson's administrative complaint. There is also no dispute that the delay was not due to any bad faith on

Gunderson's part.  Under the plain language of 20109(d)(3) then, Gunderson has a right to bring an action in Federal District Court."

Plaintiff objects to defendant's motion seeking summary judgment prior to even answering the complaint, cutting off plaintiff's discovery rights.  Without waiving the objection, plaintiff affirmatively states that at the present time with no discovery afforded, the only responsive brief he can file in opposition to defendant's motion is the summary judgment brief he filed with the ALJ.  Plaintiff objects to the affidavit of previously undisclosed witnesses Mark Redd and Justin Dittrich-Bigley.  As stated in our Rule 56(d) affidavit, paragraphs 5 and 6, Respondent omitted from their initial disclosure the two management officials who later provided affidavits for their summary judgment motion.  Mark Redd was the General Manager Operations, US West Region.  Redd is the management officer who allegedly made the decision to terminate Ken Henin.  Justin Dittrich-Bigley is Manager of Labor Relations with Soo Line.  The first time Redd and Dittrich-Bigley were disclosed was on April 19, 2017, after the close of discovery, in Respondent's Trial Witness List.  The affidavit is inadmissible due to lack of attestation and due to failure to disclose these witnesses prior to the close of discovery in the ALJ proceeding.

Plaintiff Kenneth Henin respectfully submits this Memorandum of Law in Opposition to Defendant's Motion to Dismiss or Alternatively, Summary Judgment.  If the Court does not grant our objection to this premature summary judgment motion, we will seek leave to submit the voluminous exhibits submitted in the ALJ proceeding. We will utilize the same exhibits and exhibit numbers that defendant has filed in the ALJ proceeding.  Defendant filed these exhibits with their ALJ summary judgment motion.  If defendant objects to the accuracy of the Statement of Material Facts below, plaintiff will file the same exhibits utilized by defendant in the ALJ summary judgment motion.  In filing this brief, which duplicates our filing with the ALJ, plaintiff does not

consent to summary judgment and does not consent to consideration of any matters outside of the pleadings.

## INTRODUCTION

On May 8, 2010 Ken Henin had an argument with his supervisor about inconsistent interpretation of radio rules in the railyard.  His supervisor sent him home for the day.  Henin was injured at work on the evening of May 10, 2015, and reported the injury to his supervisor immediately by radio.  On May 13, 2015, CP sent him a notice of termination hearing for "failure to accurately report the details of an incident in which you stated you were injured."   CP also claimed that Henin failed to use a flashlight during daylight hours at the time he fell.  Five days later, CP sent a second notice of termination hearing, alleging that on May 18, 2015, he violated a rule by "failure to separate cars by 50 feet and properly secure cars before going in between equipment to adjust a drawbar."  CP held two hearings back to back on May 28, 2015, and fired him twice.   CP claims that even if it violated the whistleblower law by terminating plaintiff for reporting an injury, he has no damages because they would have fired him anyway for the second alleged rule violation.  There is evidence that the second termination is a pretext and distraction created by CP.  While CP has submitted hundreds of pages of rules, depositions, termination hearing transcripts, collective bargaining agreements, affidavits and other documents, this is really a very simple case.  CPs own documents show that plaintiff was fired for reporting an injury at work. Did plaintiff report his injury in good faith?  Are the other two alleged violations pretexts? These questions cannot be decided on paper.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

There are four factual issues which preclude summary judgment:  1) Was Henin fired for reporting a work injury in good faith?  2) Did he really need to use a flashlight during the daytime,

or is this evidence of pretext?  3) Did he violate an amended version of a rule that he was not charged with violating?  4) Did his safety complaints have anything to do with defendant's campaign to fire him?

### 1.  The May 10, 2015 Injury

 Henin was engaged in coupling air hoses between two cars when he fell.  As he stepped in to accomplish this task, "my right foot landed on a round seal lock that locks doors on auto racks, and my foot went out from under me and I fell forward." (116-117). After he fell, he gave the seal lock he stepped on to the trainmaster.  (125)  Henin is not entirely sure about the exact movements of his body when he fell.    His right leg went on one direction, he lost traction, and fell towards the knuckle.  It all happened very quickly.  At first he thought he hit his head on the knuckle, but later:  "Maybe I thought I did was my hands hit it and, instinctively, you want to get out from in between cars, I pushed back and landed on my back.  Later we looked and my hands were dirty, but my head had nothing on it and my hat had nothing on it.  It happened kind of quick." (126-127) He landed on the ground and "was a little shaken up, as old as I am, to be falling down." (127)  He had laid on the ground for a few minutes after he fell, and his engineer came to his assistance. (128)

Henin wanted to report his fall right away, because "if you don't report an incident, you can get in trouble; if you do report an incident, you can get in trouble.  So I – in case I was feeling bad the next day medically, I wanted to make sure I at least reported it.  I was just trying to do the right thing."  He discussed this with his co-worker, and then telephoned his supervisor Mr. Michael Strahlman to report it.  In the phone call (which was overheard by the co-worker), Henin told Strahlman that he might have hit his head, but might not have. (128)  Strahlman said "have a seat. I'm on my way."  It took Strahlman over an hour to arrive. (129)   Henin agreed that at first he was

unsure whether or not he hit his head, but by the time Strahlman arrived, he had concluded that he had not hit his head.  (183)  "I told him I didn't think I'd hit my head.  It just didn't seem like it. My head was not sore.  It was more of my right leg and a little bit of my back, it was a little stiff…It was just a formality to report.  I wanted to go to work." (130)         Strahlman wanted Henin to write a description of what happened on a blank piece of paper, but Henin wanted to follow company procedure and fill out what is known as a "Marvin Report", which has been the procedure for many years. (132)  "I just had it in my mind that a MARVIN report is a form of reporting, because it is." (135)  He understood that he was obligated to fill out a Marvin Report and wanted to follow the rules, not write a narrative on a blank piece of paper.  (137)

The accident happened on the evening of May 10, 2015.  On May 13, 2015, he received a CP Notice of Investigation for reporting injury inaccurately and for not using a lantern.  "I was shocked and flabbergasted that I had an investigation for doing the right thing, reporting an injury, when I wasn't even really hurt.  I just had fell.  I wanted to report it.  I was just shocked.  And I asked him (Superintendent Tom Jarad), you know, "what the heck are we doing here?  Why am I getting this?"  And he said that Mike Strahlman arranged it, and that was it.  He didn't want to talk to me any further about it." (140)

## 2.      The Termination Hearing – Injury Reporting

Mr. Henin and his engineer Mark Lynn testified at the termination hearing.     Lynn had worked for CP for 35 years, in many crafts including management.  Lynn was eyewitness to the fall.  His testimony is summarized accurately and in detail at pages 2 to 4 of defendant's Exhibit C, which is a Railway Labor Board Grievance Appeal Letter from Mr. Henin's union representative.  Lynn testified that he saw the fall, and ran up to where Mr. Henin fell, fearing the worst.  He testified that Henin was not sure if he hit his head or not.   He testified that during the

meeting with Mr. Strahlman, Henin's story never changed – he was simply not sure exactly what happened when he fell.  Lynn also testified that a Marvin Report is the report that is required following an injury, and confirmed that Mr. Henin was more than willing to complete a Marvin report. (Transcript of hearing, pages 79-85, Exhibit G)   The railroad called no eyewitnesses, but only called Strahlman and a Rodney McCorkle, a CP Rules Manager, who testified about his own private theories about how Mr. Henin fell.  The ridiculous nature of McCorkle's testimony is summarized at pages 3-4 of Exhibit C.

### 3.      The Termination Hearing – the Flashlight

In addition to accusing him of falsely reporting a work injury, CP also alleges that he should have been using a flashlight when he was hurt.  The "flashlight violation" is very obviously a pretext. The accident was not witnessed by Strahlman, and there is no evidence that a lantern was needed.  It was not dark out when he tripped and fell, and the lantern is obviously not needed unless the amount of light is insufficient to see.  When to utilize a lantern is the individual worker's prerogative, when the worker thinks they need it.  (108) The Cottage Grove Auto Facility where he fell is so lit up by electric lights that you do not need a lantern there for most activities, even at night.  (109)  This "add on" violation is an obvious distraction from the injury report violation.

The only two eyewitnesses were Mr. Henin and Mr. Lynn. At the termination hearing, Henin testified that it was not dark, and there was plenty of daylight.  Lynn testified that it was light out, the sun had not gone down yet, and visibility was good.  In fact it was so good that Lynn could see Mr. Henin fall 600 feet away just fine. (Transcript of hearing, pages 49-51 and 84-87) The only other witness to testify, Strahlman, admitted that he did not arrive on the scene until 90 minutes later, at which time it was dark.

Pretext is demonstrated by the fact that the two eyewitnesses testified that it was not dark and there was no need to use a flashlight, yet CP found Henin guilty of a flashlight violation. Lynn had no incentive to lie. Additionally, there was no claim that the use or non-use of the flashlight had anything to do with the injury.

### 4. The May 18, 2015 Car-Coupling Incident

On May 18, 2015, Henin was coupling cars in the Cottage Grove auto railyard. Strahlman was surreptitiously watching him. On May 20, 2015, CP mailed him a letter charging him with violating the 50-foot rule, known as Rule T-5, which prohibits going between rail cars that are less than 50 feet apart. The hearing on this second alleged violation of Rule T-5 was conveniently scheduled to immediately follow the first hearing on the injury reporting/flashlight violation charges.

There was no rule violation according to Henin's understanding of the rules. (150) Rule T-5 as Henin understood it, stated that you must either have 50 feet of separation, "and/or three point protection." Henin had three point protection, and this is not disputed. (159) The Rule states "Ensure three point protection is in place and/or cars are secured with 50 feet separation." Henin understood this rule to mean that if he had three point protection, he didn't have to maintain a 50 foot separation. (Henin deposition page 157, lines 14-21; page 158, lines 12-25) Henin testified that if you have three point protection (which he did have), there is no need to have a 50 foot car separation. (161, lines 12-18) He testified "so you can see where the "and/or" is kind of a key phrase there." (160, lines 1-2)

In the present motion, defendant now claims that plaintiff violated an amended version of this rule dated January 1, 2015 which eliminates the ambiguous and/or language. At the hearing, he was not charged with violating the amended version of the rule. In his deposition, Plaintiff

testified that he had never seen this amended version of the rule.  This amended version is attached to the Affidavit of Michael Strahlman dated April 13, 2017, and Strahlman claims that he now remembers that "this rule was posted at the Cottage Grove auto facility".   The amended version of the rule reads "ensure that equipment is secured and three point protection is provided."  The same Michael Strahlman who signed this affidavit actually read the version of the rule Mr. Henin was charged with violating into the record in the termination hearing - "ensure that equipment is secured and/or three point protection is provided" (transcript page 18, Exhibit I).   This    shifting explanation of the reason for plaintiff's second termination is clear evidence of pretext.  Strahlman comes close to committing perjury in his April 13, 2017 by claiming that Henin was terminated for violating a rule that he was not charged with violation.

### 5.    Henin's Safety Complaints and dispute with his supervisor over dangerous inconsistent rule interpretations

Henin complained about inconsistent interpretations of the rules for ending radio transmissions.  Supervisor Strahlman told Henin that he did not need to end radio transmission with the phrase "over and out".   Superintendent Tom Jared told him he needed to end every radio communication with "over and out."  (98)  At a May 8, 2015 meeting, he had a heated discussion with Mr. Jared about the inconsistent interpretations of radio rules and about inconsistent interpretations of rules regarding spotting cars.  (99, 101)  Mr. Jared looked Henin directly in the eye and ordered him to go home. (102)  He fell and reported an injury on May 10, 2015, and was terminated on June 5, 2015, less than a month later.   Henin believes he was retaliated against due to the timing:  "One incident in 13 years, and the night that I point out a couple safety issues to a superintendent and then was sent home immediately after pointing them out and several days later I was terminated, it seemed, in my opinion at that time, awfully coincidental. One incident in 13

years and then to report an injury that I wanted nothing from….I just thought I was doing the right

thing in calling in an injury report.  And it went downhill from there." (104-105)

## ARGUMENT

A summary judgment motion is not an occasion to decide a case on the merits on paper.

Credibility and pretext cannot be determined on paper alone.   There is a very light burden of proof

faced by a plaintiff in an FRSA case, and a very heavy burden of proof faced by a

defendant/employer.  Under 29 C.F.R. 1982.109, a discharged worker only needs to prove "by a

preponderance of the evidence that the protected activity was *a contributing factor* in the adverse

action alleged in the complaint."   If plaintiff satisfies this very light burden, defendant faces a

heavy burden:

> If the plaintiff has satisfied the burden set forth in the prior paragraph, relief may
> not be ordered if the defendant demonstrates by clear and convincing evidence that
> it would have taken the same adverse action in the absence of any protected
> behavior.

The "clear and convincing evidence" standard for all practical purposes guarantees to

terminated workers a right to a hearing.  Evidence cannot be clear and convincing on paper alone

– credibility, demeanor, motive, and weight of circumstantial evidence, can only be evaluated with

live testimony.  There are many fact disputes present in this case.   The main issue is the termination

for reporting an injury.   The secondary issues (which are not essential to this motion) are whether

the alleged flashlight and 50-foot rule violations were pretexts to justify termination and therefore

limit damages in the event that the injury reporting termination is found to violate the law.

The issue of pretext turns heavily on credibility.  In *Rachid v. Jack in the Box*¸ 376 F.3d

305 (5th Cir. 2004), the Court of Appeals held that summary judgment is inappropriate where there

is any dispute about pretext.  When there are "sharp disagreements" about the facts, "live testimony

will assist the necessary credibility choices in this case more effectively than printed affidavits." The *Rachid* case is cited in the C.F.R. comments at 29 C.F.R. Part 1982 at p. 53524.

If there is any dispute about the real motivation for termination, summary judgment is inappropriate. In 29 C.F.R. 18.57(b), the Regulation states, "the decision of the administrative law judge shall include findings of fact and conclusions of law, with reasons therefor, upon each material issue of fact or law presented on the record. The decision of the administrative law judge shall be based upon the whole record. It shall be supported by reliable and probative evidence. Such decisions shall be in accordance with the regulations and rulings of the statute or regulation conferring jurisdiction." Here, is there any dispute that plaintiff was fired for reporting a workplace injury? Did the safety complaints contribute in any way to the termination? While the railroad has cited regulations permitting discharge for virtually every type of misconduct, are there any other examples where long term employees were fired for alleged inaccuracy in an initial verbal injury reports? Were any other employees disciplined for not using a flashlight in the daylight? Are there any other examples of persons fired for interpreting the rule about "50 feet of separation and/or three-point protection" as providing two alternative methods of protection?

In *Matter of Robert Henderson*, 2012 WL 5391422 (ARB Case No. 11-013), the Administrative Review Board denied summary judgment due to a letter from the railroad summoning the plaintiff to a formal investigation hearing "in connection with Henderson allegedly sustaining a personal injury to his back." Henderson was terminated after the hearing. The same type of language was used by CP in the letter to Henin, and the outcome of the termination hearing was the same. Regardless of any elaborate explanations and justifications submitted by the railroad, the letter in itself was sufficient to deny summary judgment:

"The first sentence alone implicates an alleged report of a work injury…The termination letter references a "formal investigation" related to these reported injuries and a termination following the investigation. Viewing these statements in the light most favorable to Henderson, we conclude that an evidentiary heating must resolve whether the reference to protected activity in these letters suggests that protected activity was a contributing factor.  At such a hearing, a defendant may be able to explain or minimize the intent of these statements, but it cannot accomplish this on a motion for summary judgment…We appreciate the bind that this may place on employers; however, on a motion for summary decision, it would be improper to ignore the inextricably intertwined alleged protected activity and the adverse action and somehow conclude that they had nothing to do with each other…The temporal proximity between his protected activity and the adverse action is sufficient to raise an inference of causation….In this case, where no hearing has occurred, the record raises a presumptive inference of causation….Typically, a presumption is rebuttable at an evidentiary hearing on the merits but that issue is not before us…In analyzing the affirmative defense, it is not enough to confirm the rational basis of W&LE's employment policies and decisions.  Instead, we must assess whether they are so powerful and clear that termination would have occurred apart from the protected activity."

This rationale makes sense, because defendant's burden is to produce clear and convincing evidence.  This cannot be done on paper, regardless of how many pages of rules, transcripts, and affidavits are submitted.  Plaintiff need only establish that the injury report was a contributing factor.  Here, the termination hearing letter, the transcript and the letter firing plaintiff are all due to his report of a workplace injury.  Defendant thus cannot deny the "contributing factor", even with thousands of pages of documents.  Here, defendant has submitted a 195 page transcript of Henin's seven hour long deposition, a 114 page transcript of the termination hearing for injury reporting, a 50 page transcript of the "and/or" termination hearing, numerous pages of rules and regulations, and even more paper.  Defendant's heavy burden of proof cannot be met by these documents.  Defendant's invitation to spend a dozen or more hours reading transcripts can be and should be declined.  Credibility, good faith, and demeanor can all be assessed in a few hours in a

CASE 0:19-cv-00336-PAM-BRT   Doc. 64   Filed 05/10/21   Page 13 of 20

hearing. These often dispositive questions cannot be answered regardless of how heavily the railroad and its legal department has papered the file.

### 1.       Preponderance of the Evidence versus Clear and Convincing Evidence.

For at least 100 years, American railroads have fired workers for filing injury claims and gotten away with it. There was also a culture of firing persistent critics of the railroads' safety practices. It is for this reason that the federal government enacted the whistleblower provisions of the Federal Railroad Safety Act in 2010. In *Stone and Webster Engineering v. Herman*, 115 F.3d 1568, 1573 (11th Cir. 1997), the court noted that the new whistleblower statutes differ from the "sprawling body of general employment discrimination law," because there is a new and unique burden of proof, much easier for plaintiffs, and much harder on employers. The employee only need make a *prima facie* case that the protected conduct was a *contributing factor* in the termination, not the sole or even a major factor. The employer must then offer clear and convincing evidence that it would have done the same thing in the absence of such behavior. The court stated at page 1572:

> For employers, this is a tough standard, and not by accident. Congress appears to have intended that companies in the nuclear industry face a difficult time defending themselves.

*Nicole Anderson v. Amtrak*, Case No. 2009-FRS-00003, is the first case decided by the Department of Labor under the Federal Rail Safety Act. A copy of the opinion of Judge Steven B. Berlin is attached hereto. Judge Berlin discussed the clear and convincing evidence standard at page 22, stating:

> Clear and convincing evidence is evidence indicating that the thing to be proved is highly probably or reasonably certain. Black's Law Dictionary 577. As a general proposition, proof that an employer's explanation is unworthy of credence is persuasive evidence of discrimination because once the employer's justification has

been eliminated, discrimination may well be the most likely alternative explanation
for an adverse action.

In *Anderson*, the court found it very significant that Amtrak was unable to "cite a single instance
where any other employee was fired for anything like what happened here."  This fact, in itself,
was sufficient to negate the "clear and convincing" evidence that the railroad submitted.

 Defendant implies that plaintiffs can only succeed by conclusively proving that
defendant's stated reasons for termination are false.  This is not the law, per the US Supreme Court.
*Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000); *Desert Palace Inn v. Coste*, 539 U.S. 90
(2003).  In *Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000), the Supreme Court held that in
a discrimination case, plaintiff is not required to actually prove that defendant's reasons for
termination are false.  Pretext can be established in many ways not evident on paper.  The Supreme
Court noted that credibility determinations, weighing of the evidence, and drawing inferences of
the facts are not appropriate in a summary judgment motion.  The Court held that it is "*permissible*"
for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's
explanation:

> Such an inference is consistent with the general principle of evidence law that the
> fact finder is entitled to consider a party's dishonesty about a material fact as
> "affirmative evidence of guilt."  Moreover, once the employer's justification has
> been eliminated, discrimination may well be the most likely alternative explanation,
> especially since the employer is in the best position to put forth the actual reason
> for its decisions.

Evidence of falsity would include the fact that no other employees have been terminated for similar
conduct.  This would include the fact that until the Henin termination, no other employee has ever
been terminated or even charged with a violation for not using a flashlight during daylight hours.

In *Desert Palace Inc. v. Costa*, 539 U.S. 90 (2003), the Supreme Court went a step further and held that direct evidence of discrimination is not always required or available. The Court held at page 100 that circumstantial evidence is very important in discrimination cases:

> Evidence that the defendant's explanation for an employment practice is unworthy of credence, is one form of circumstantial evidence that is probative of intentional discrimination. . . . The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence, *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500 (1957).

The Court also noted that juries are routinely instructed that the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.

Defendant has submitted dozens of pages of rules from its rule books. Proof on paper of plaintiff's alleged violation of rules does not mean defendant wins summary judgment on the issue of retaliatory discharge. If this were the case, employees would always lose – they usually only have their own testimony and that of a coworker, while the railroad has a vast legal and claims department tasked with neutralizing this type of claim. Even assuming that Henin is guilty of any rule violations (which we deny), proof that other employees were not subject to the extreme sanction of dismissal for similar treatment is sufficient, *in itself*, to support a claim of pretext. *Harvey v. Anheuser Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) ("instances of disparate treatment can support a claim of pretext.")

But at the summary judgment stage, plaintiff is not required to directly contradict or disprove defendant's articulated reasons for discharge. *O'Bryan* at 1192. All plaintiff needs to do is to adduce enough evidence "to raise doubt as to the *legitimacy of the defendant's motive*, even if that evidence did not directly contradict or disprove defendant's articulated reason for its actions." The severity of the discipline alone may be sufficient to show pretext. In *Timmerman v.*

*U.S. Bank*, 483 F.3d 1006, 1122 (10ᵗʰ Cir. 2007), the court stated "We have previously held that disturbing procedural irregularities surrounding an adverse employment decision may demonstrate that an employer's proffered non-discriminatory business reason is pretextual."

### 2.    Good faith and credibility cannot be decided on summary judgment, regardless of how much paper and complication defendant submits.

 In the present case, defendant cannot dispute that the reason for termination was Mr. Henin's report of an injury. CP's June 5, 2015 letter setting up the termination hearing states that the reason is "an incident in which you stated you were injured."   This letter in itself creates a prima facie case.  Did Henin report his injury in good faith, or was he making a false report?   Good faith vs. bad faith is almost never a question that can be decided on paper in a summary judgment motion. There are several other on-point cases where a worker was accused of falsifying an injury report. Thomas v Union Pacific, 2016 WL 4473429 (D. Oregon 2016); *Ray v Union Pacific*, 971 F. Supp. 2d 869 (S.D. Iowa 2013); *Carter v BNSF*, 2016 WL4238480 (US Dept of Labor).

 In *Thomas v Union Pacific*, 2016 WL 4473429 (D. Oregon 2016), the plaintiff alleges that she sustained hearing loss due to exposure to a very loud and unexpected noise from a locomotive. Two days later, her supervisor sent an email to other supervisors stating that "as he researched her alleged hearing loss incident, he was finding discrepancies such as an incorrect report of the injury date.  He specifically requested that he be allowed to charge plaintiff with dishonesty in reporting her injury and to terminate her." One of the main issues, according to the US District Court, was whether she reported her injury in good faith.   Defendant filed a summary judgment motion, and plaintiff submitted her deposition transcript to show that there was a fact dispute.  The court held that "these facts create an issue as to whether plaintiff actually subjectively believed that her hearing loss was caused by a noise incident at work.  Accordingly, because there is an issue as to

plaintiff's good faith, I deny summary judgment." The Court held that a genuine issue of material fact existed as to whether plaintiff was terminated because of her injury report.

Similarly, in *Ray v Union Pacific*, 971 F. Supp. 2d 869 (S.D. Iowa 2013), the defendant railroad alleged that "plaintiff changed his story regarding the circumstances of his injury at least four times", and for this reason they fired him for dishonesty. The railroad argued that it reasonably believed that plaintiff was fraudulently reporting his injury, and they had a zero tolerance policy for dishonesty. The Court noted that the railroad had a particularly tough burden for summary judgment, because the reason plaintiff was fired was for submitting an injury report. Regardless of defendant's policies, and even assuming that plaintiff was dishonest with defendant in the past, "the relevant inquiry remains whether, at the time he reported his injury to defendant, plaintiff genuinely believed that his injury was work related." Ray at page 884  The Court noted that the scope of this inquiry was set by Section 20109, which prohibits discharge due "in whole or in part due to the employee's lawful, good faith act done to notify the railroad carrier of a work related personal injury." In the present case, defendant claims that the report was dishonest and in bad faith, while plaintiff claims that while he was confused about exactly what happened in the fall, and he reported this honestly and in good faith.  The court noted that the FRSA only required plaintiff to show that his protected activity was a "contributing factor,…not the sole or even predominant cause." A contributing factor "is any factor which alone or in combination with other factors, tends to affect in any way the outcome of the decision." Defendant argued that the railroad reasonably believed plaintiff was dishonest, and therefor had an honest basis to discharge him. The court held that there was a "genuine issue of material fact as to whether his protected activity was a contributing factor in his termination, both because of the temporal proximity between the report and the subsequent investigation, and because plaintiff's report in inextricably intertwined

with the adverse employment action."  We have the exact same situation in the present case, and summary judgment should be denied for the same reasons.

Similarly, in *Carter v BNSF*, 2016 WL4238480 (US Dept of Labor), plaintiff alleged that BNSF fired him because he filed a PI report in 2007.  He filed a FELA lawsuit in 2008, and after his 2009 deposition, defendant brought dishonesty charges against him due to alleged inconsistencies, and a second set of charges because he was late for work and was dishonest in reporting why.  Like CP in the present case BNSF conducted two separate investigations, and fired plaintiff twice.    The ALJ found for the plaintiff and awarded punitive damages.  BNSF argued that it fired him for dishonesty, not for reporting an injury.  The reviewing judge stated "we agree with the ALJ that it is pure semantics to separate the "report of injury" from the injury itself."  The ALJ correctly concluded that "BNSF used the second firing as "insurance" to ensure that Carter would be fired one way or another because of his protected activity."  The concurring judge commented on the "chain of events theory of causation":  "The fact that the protected activity falls in the chain of events leading to unfavorable employment actions can be powerful evidence that it affirmatively influenced the employer's decision-making."  The exact same rationale should be applied to the present case.  While CP may claim that it sincerely believed that Henin was lying, it faces a steep burden in proving such an affirmative defense where the injury report was admittedly the start of the chain of events leading to the termination.  "A defendant's burden to prove the affirmative defense under the FRSA is purposely a high one…Congress intentionally drafted the burdens of proof to provide plaintiffs with a lower hurdle to clear than the bar set by other employment statutes."  *Ray* at page 889.

## **CONCLUSION**

Plaintiff reported an injury at work on May 10, was accused of false reporting on May 13, and was fired.  While his termination hearing was pending, defendant CP realized that it had some jeopardy for firing plaintiff for reporting an injury.  Plaintiff was then accused of a technical rule violation which he allegedly committed on May 18, and was "double fired."  Defendant CP has submitted hundreds of pages of rules, depositions, affidavits, and union grievance transcripts, and argues that all of this paper justifies summary judgment.   Regardless of how heavily defendant has papered the file, there is a fact question about whether plaintiff reported his work injury in good faith.  If he did so, and was fired for doing so, he wins.  The flashlight and the "and/or" alleged rule violations, which obviously were pretexts, do not need to be addressed in deciding this motion.   Pretext, like honesty and good faith, is an issue which cannot be decided on paper, and depends on testimony at trial.    The fact that plaintiff made other safety complaints about inconsistent rule interpretations may become relevant on the issue of defendant's motive and intent.  Summary judgment should be denied, and there is no need to address most of the other issues raised by railroad and their 5 pounds of paper exhibits.

Respectfully submitted,

Dated:  May 10, 2021                              BREMSETH LAW FIRM, P.C.


                                                  /s/Keith E. Ekstrom
                                                 Keith E. Ekstrom, MSBA #181808
                                                 Fredric A. Bremseth, MSBA #11149
                                                 601 Carlson Parkway, Suite 1050
                                                 Minnetonka, MN 55305
                                                 (952) 475-2800
                                                 kekstrom@bremseth.com
                                                 fbremseth@bremseth.com

                                                 ATTORNEYS FOR PLAINTIFF

### CERTIFICATE OF SERVICE

        I hereby certify that on the 10th day of May, 2021, a true and correct copy of the
foregoing was served on the following via email:


Tracey Holmes Donesky
Greta Bauer Reyes
STINSON LEONARD STREET LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Tracey.donesky@stinson.com
Great.reyes@stinson.com

ATTORNEYS FOR DEFENDANT

*Duly signed copy on file in the offices of Bremseth Law Firm.*


                                                  /s/Barbara Nafstad
                                                 Barbara Nafstad, Paralegal